**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

UNITED STATES OF AMERICA,

                **Plaintiff,**

v.                                         **No. 2:09-cr-20068-SHM-cgc**

JAMES BAKER,

                **Defendant.**

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant James Baker's Motion to Suppress. (D.E. #35.) The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation. (D.E. #36.) The Court held a hearing on March 5, 2010, after which the parties submitted post-hearing briefs addressing the issues raised in the instant motion. For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**I. Proposed Findings of Fact**

On June 14, 2008, Officer Mark Reese ("Officer Reese") of the Memphis Police Department ("MPD") was on duty and was patrolling Northside Manor Apartments ("Northside Manor"). (Tr. at 6-8.) Officer Reese had served as a MPD officer for approximately four-and-a-half years and had previously worked as a Police Service Technician and served in the United States Marine Corps. (Tr. at 6-7, 16.) At Northside Manor, Officer Reese was "working on drug complaints that came in" and "looking for suspicious activity." (Tr. at 6-8, 19.) Officer Reese was not investigating specific

1

complaints on that date, but his lieutenant had advised "a day prior or so" that he was "getting complaints" about Northside Manor and that both management and a maintenance employee were "'calling, saying it's the wild, wild west over [there].'" (Tr. at 18.)  Officer Reese knew it was "an area that had lots of gang activity and lots of drug activity" because he had patrolled there "pretty much every day" during his tenure as a police officer.  (Tr. at 7-8.)  Officer Reese was also "really familiar" with the area because he "grew up in that area and had lots of friends when [he] attended high school that stayed over there."  (Tr. at 8.)

While patrolling, Officer Reese observed an individual, who was later identified as the Defendant, "standing next to a vehicle," conversing with individuals, "going back and forth to an apartment," and engaging in a "hand-to-hand transaction involving money."  (Tr. at 9-10.)  During the transaction, the Defendant "received the money."  (Tr. at 10.)  However, Officer Reese did not specifically view any drugs involved in this initial transaction, just a "plastic baggie."  (Tr. at 32.)  When Officer Reese observed the transaction, it was still "daylight" and he was parked roughly thirty to forty feet away.  (Tr. at 10-11, 19.)  Officer Reese was in an unmarked car and was not in uniform.  (Tr. at 11.)

After this initial transaction, Officer Reese and his partner watched the vehicle that the Defendant had approached "drive off," (Tr. at 11), and the Defendant walked away towards the apartments.  (Tr. at 31, 35.)  Officer Reese alerted the "marked police unit" that was working with them and that was "hid[den] around the corner" to "make a stop on the vehicle" because "it appeared to be a drug transaction."  (Tr. at 11, 31.)  Officer Reese stated that he believed that stopping this vehicle was appropriate because it would have evidence of "drugs and pills or whatever."  (Tr. at 36.)  However, Officer Reese elected not to approach the Defendant after this initial transaction

2

because he believed from his "history of dealing with individuals who sell narcotics" that the Defendant would only have money on his person rather than illegal drugs.  (Tr. at 35.)   Thus, Officer Reese believed based upon his dealings "in that area" that "normally they don't keep drugs on them" and keep only "whatever they have to sell to whatever individual they're selling to."  (Tr. at 35-36.)  Thus, because "there's no crime for having money in your pocket," he continued to investigate and observe in attempt to "go after the drugs."  (Tr. at 35.)  He further testified that, while he believed that he had sufficient evidence to make a stop of the Defendant based upon this initial transaction, he "picked a different battle."  (Tr. at 35-36.)

Following this initial transaction, Officer Reese and the Defendant dispute what occurred. Officer Reese testified that he was "leaving the complex" or "attempting to exit" when he saw the Defendant return and begin to approach a second vehicle.  (Tr. at 11-12, 31, 36-37, 51-52.)  Officer Reese asserts that he was approximately eight feet from the Defendant when he saw him with a firearm in his back pocket, which he initially thought that the Defendant was "pulling."  (Tr. at 12, 32-33, 36-38.)  Instead of brandishing the weapon, Officer Reese testified that "that's when he got the crack" from his back pocket, and Officer Reese could "see the crack" and "see the gun."  (Tr. at 37-38.)

Officer Reese testified that he was familiar with firearms, as he had served in the Marine Corps Infantry.  (Tr. at 53.)  Officer Reese stated that the drugs "appeared to be crack" in a "clear plastic baggie."  (Tr. at 42.)  Officer Reese testified that he formed this opinion based upon his previous arrests involving crack cocaine, his familiarity with the appearance of crack cocaine, and his familiarity with the manner of packaging crack cocaine. (Tr. at 52-53.) Officer Reese stated that he noticed that the Defendant was not "trying to hide" the drugs, or in Officer Reese's terms, "was

3

using no security," as they were "plain" to view.  (Tr. at 43.)

Officer Reese testified that, when he realized that the Defendant had a firearm, he told the marked police unit to abandon its efforts to pursue the previous car, despite his belief that it contained evidence of the previous drug transaction, and to "[g]et back here."  (Tr. at 13, 37.) Specifically, Officer Reese told the marked police unit, "He's got a gun.  He's got a gun.  He's got a gun."  (Tr. at 13, 33, 39.)  Officer Reese stated that the marked police unit had been able to stop the initial vehicle suspected of involvement in the drug transaction but that the officers were only able to briefly ask for the occupants' identification before Officer Reese alerted them to return to assist with the Defendant.  (Tr. at 32.)  Thus, the marked unit had to "just let the other vehicle go" and "[n]othing was recovered."  (Tr. at 32-33.)  Officer Reese says that he chose this course of action because of the "safety issue" that had arisen with the Defendant once he saw the firearm and the Defendant approaching a second vehicle with crack cocaine.  (Tr. at 33.)  In response to these observations, Officer Reese testified that he "made a U-turn in the parking lot" and proceeded toward the Defendant.  (Tr. at 13-14, 29, 40-41.)

The Defendant disputes Officer Reese's version of events, particularly with respect to where Officer Reese was when he says he viewed the firearm and crack cocaine.  Specifically, the Defendant states that Officer Reese was at the "beginning of the driveway."  (Tr. at 58.)  Although the Defendant was not asked to speculate as to the length of this distance, Officer Reese previously testified that the length of the entire driveway was "really long" and "maybe a quarter mile."  (Tr. at 19.)[1]  On cross-examination, the Government sought to impeach Defendant's credibility based

_____

[1]  On two occasions, the Defendant references a distance of one hundred yards.  In Defendant's Reply to the United States's Response to Defendant's Motion to Suppress ("Def.'s Reply"), Defendant asserts that the "Memphis Police Department observed the defendant

4

upon his prior felony convictions: felon-in-possession of a handgun in May, 2000; aggravated burglary in May, 2000; theft of property in December, 2005; and aggravated burglary in August, 2007. (Tr. at 61.)

Upon consideration of the conflicting testimony with respect to the second transaction, the Court must determine by a preponderance of the evidence which version of events to accredit. See Lego v. Twomey, 404 U.S. 477, 488-89 (1972); Colorado v. Connelly, 479 U.S. 157, 168-169 (1986). In this instance, the Court is compelled that Officer Reese's actions on the date in question substantiate his version of events. Specifically, Officer Reese instructed the marked police unit to abort its stop of the initial vehicle, which he believed contained the evidence of an illegal drug transaction involving the Defendant, in order to return to the scene to assist with the "safety issue." (Tr. at 12, 32-33, 37-39.) Because Officer Reese acted in a manner consistent with his observation of a firearm and another potential illegal drug transaction in progress, the Court finds that the evidence preponderates in favor of accrediting Officer Reese's testimony regarding his observation of the Defendant with a firearm and crack cocaine.[2]

_____

walking south across a parking lot from a distance of over one hundred (100) yards." Def.'s Reply at 1. In Defendant's post-hearing Position on Motion to Suppress ("Def.'s Position"), Defendant asserts that the "front drive way into the Northside Manor apartments is over one hundred (100) yards long." Def.'s Position at 1. However, the Defendant provides no citation to these assertions regarding the distance, and the record before the Court does not reference any such distance of one-hundred yards.

[2] At the hearing on the instant motion, Defendant noted that Officer Reese testified on one occasion that he "left" the complex before the second transaction, but on other occasions that he was "leaving," "attempting to exit," "about to leave," or "attempting to leave." (Tr. at 11-12, 31, 36-37, 51-52.) When asked about this inconsistency, Officer Reese testified that he "never left the complex" and was "sorry" for any confusion with his testimony. (Tr. at 52.) Upon consideration of the record, the Court remains compelled by Officer Reese's actions that he was sufficiently concerned about the Defendant's possession of a firearm and what he believed to be crack cocaine that he instructed the marked police units to abort the previous stop and return to

After viewing the Defendant approaching this second vehicle, Officer Reese exited his vehicle and approached the Defendant from behind so that he would not see him coming. (Tr. at 13, 44.) Officer Reese stated that he approached the Defendant carefully and inconspicuously because he "didn't want to get into a foot chase with him," "didn't want him to throw the evidence," and "didn't want to get shot." (Tr. at 44-45.) Officer Reese's partner "went to the vehicle that he was making a transaction with" and "went to the driver's side of that vehicle and made contact with the driver of the vehicle." (Tr. at 13.)

When Officer Reese approached, the Defendant had "one hand on top of the vehicle that was holding a bag of crack cocaine" and was conversing with the occupants of the vehicle. (Tr. at 14.) Officer Reese "approached him from the back," "grabbed his right hand," and used his left hand to hold the gun in the Defendant's back pocket. (Tr. at 14.) The Defendant "didn't resist in any way" but simply said, "[p]olice, police." (Tr. at 14, 45, 47.) Officer Reese subsequently retrieved both the firearm and the drugs, placed the Defendant in handcuffs, and took him into custody. (Tr. at 15, 49.)

During this process, Officer Reese testified that the Defendant immediately stated, "I have a gun in my back pocket." (Tr. at 14.) Officer Reese replied, "I already know" because he had his "hand on the gun." (Tr. at 47.) However, Officer Reese did not include the Defendant's statement regarding having a gun in his pocket in the arrest ticket. (Tr. at 47-48.) Officer Reese stated that he may not have included this information because he "saw the gun in plain view" and "already had [his] hand on the gun" when the Defendant made the statement. (Tr. at 47.) While the Defendant

---

assist. Thus, the Court finds that this apparent inconsistency does not shift the balance that the evidence preponderates in favor of accrediting Officer Reese's testimony.

appears to implicitly argue that the Court should not accredit Officer Reese's testimony regarding the Defendant's statement because it was not included in the arrest ticket, the Court does not find that the absence of this detail is sufficient to preponderate against his testimony given under oath regarding the Defendant's statement.

Finally, with respect to the Defendant's clothing on the date in question, the parties dispute whether the Defendant was wearing clothing that could have prevented Officer Reese from viewing the firearm. Officer Reese testified that he did not "recall what he was exactly wearing" but that he was able to view the firearm. (Tr. at 13, 20, 32-33, 37-39.) However, Defendant testified that he was wearing a shirt that, in length, hung to the middle of his thigh, between his hip and knee. (Tr. at 57.) Defendant stated that his shirt was "untucked" and covered the back pockets of his pants. (Tr. at 57.)

Despite the dispute between Officer Reese's testimony and the Defendant's supposition that it was not possible to see the back pocket of his pants due to his clothing, the Court finds that the evidence preponderates in favor of accrediting Officer Reese's testimony that he observed the firearm on the Defendant's person before approaching, detaining, and arresting him. In particular, the Court is once again compelled by Officer Reese's testimony that his observation of the firearm and what he believed to be an impending second drug transaction—and these observations alone—led him to alert the marked police unit to abandon its stop of the first vehicle despite his belief that it had evidence of the previous illegal drug transaction and to return to the scene to appropriately address the "safety issue." (Tr. at 32-33.)

## II. Proposed Conclusions of Law

The sole issue presented in the instant motion is whether the Defendant's Fourth Amendment

rights were violated during his detention and arrest and, if so, whether the evidence of the firearm, crack cocaine, and the Defendant's statement[3] regarding the gun should be suppressed.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, house, papers, and effects against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. In cases where no warrant has been obtained prior to the search or seizure, the conduct must "be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." Terry v. Ohio, 293 U.S. 1, 20 (1968). Under this principle, searches and seizures "'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions.'" Minnesota v. Dickerson, 508 U.S. 366, 372 (1993) (quoting Thompson v. Louisiana, 469 U.S. 17, 19-20 (1984)).

One such well-delineated exception to the warrant requirement was recognized in Terry v. Ohio, 392 U.S. 1 (1968), which held that, "'where a police officer observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." Dickerson, 508 U.S. at 372-373 (quoting Terry, 392 U.S. at 30). Further, the Terry court held that, "'[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and dangerous to the officer

---

[3] Defendant's Motion to Suppress solely requests suppression of the "pistol and drugs." (Def.'s Mot. to Suppress at 1.) However, Defendant's Reply and Defendant's post-hearing Position argue that any statements taken subsequent to any Fourth Amendment violations must be suppressed. (Def.'s Reply at 4; Def.'s Position at 5.) Defendant explains that he did not request suppression of the statements in his initial Motion to Suppress because he did not receive the supplemental discovery regarding this statement until after filing his Motion to Suppress. (Def.'s Reply at 2.)

or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact

carrying a weapon." <u>Dickerson</u>, 508 U.S. at 373 (quoting <u>Terry</u>, 392 U.S. at 24).

Otherwise stated, the <u>Terry</u> investigative stop allows officers to conduct a "reasonable search

for weapons for the protection of the police officer, where he has reason to believe that he is dealing

with an armed and dangerous individual, regardless of whether he has probable cause to arrest the

individual for a crime." <u>Terry</u>, 392 U.S. at 27. An investigative stop under <u>Terry</u> is limited to "that

which is necessary for the discovery of weapons which might be used to harm the officer or others

nearby." <u>Terry</u>, 392 U.S. at 26-27. Evidence obtained from an investigative stop under <u>Terry</u> will

not be suppressed unless the scope of the protective search went beyond what is necessary to

determine if the suspect is armed. <u>Sibron v. New York</u>, 392 U.S. 40, 65-66 (1968).

A second well-delineated exception to the warrant requirement is that law enforcement

officers may seize evidence of a crime that is in "plain view." <u>See</u> <u>Horton v. California</u>, 496 U.S.

128, 133-34 (1990); <u>Coolidge v. New Hampshire</u>, 403 U.S. 443 (1971). An "essential predicate"

is that "the officer did not violate the Fourth Amendment in arriving at the place from which the

evidence could be plainly viewed." <u>Horton</u>, 496 U.S. at 136. Additionally, the incriminating

character of the evidence must be immediately apparent and the officer must be lawfully located in

a place from which the object be plainly seen. <u>Horton</u>, 496 U.S. at 136-37 (citations omitted).

In the instant case, Officer Reese had made several crucial observations before approaching,

detaining, and arresting the Defendant. Initially, Officer Reese viewed the Defendant engaging in

a hand-to-hand transaction involving a "plastic baggie" where the Defendant received money. (Tr.

at 9-10, 32.) Officer Reese was only approximately thirty to forty feet from the Defendant at that

time, and it was daylight. (Tr. at 10-11, 19.) Subsequently, Officer Reese observed the Defendant

9

approach a second vehicle, and he saw a firearm in the Defendant's back pocket and a bag of what appeared to be crack cocaine in his hand.  (Tr. at 12, 32-34, 37-38, 42-43, 52-53.)  At this point, Officer Reese was approximately eight feet away from the Defendant.  (Tr. at 12.)

Finally, the Court must consider Officer Reese's observations in context of his information regarding the rate of drug and gang activity at Northside Manor.  Officer Reese was aware that "it was an area that had lots of gang activity and lots of drug activity" because he had patrolled there "pretty much every day" during his roughly four-and-a-half years as a police officer.  (Tr. at 7-8.) Officer Reese had also grown up in this area and knew it had been an area where drug and gang activity was prevalent.  (Tr. at 11.)  Most compellingly, Officer Reese had just been advised "a day prior or so" by a lieutenant that he was "getting complaints" about Northside Manor that it was "'the wild, wild west over [there].'" (Tr. at 18.)

Upon consideration, the Court finds that Officer Reese's observations of a hand-to-hand transaction where the Defendant received money, the Defendant's possession of a bag believed to possess crack cocaine, and the Defendant's possession of a firearm established, at the very least, reasonable suspicion for Officer Reese to conduct a Terry investigative stop based upon his belief that "criminal activity may be afoot."  Terry, 392 U.S. at 30.  Under Terry, Officer Reese was permitted to search for and secure any weapons for the safety of the officers and others.  Terry, 392 U.S. at 24-27.  Thus, Officer Reese's action of grabbing the Defendant's firearm because he "didn't want to get shot" is permissible under the Fourth Amendment as an exception to the warrant requirement.

Once Officer Reese secured the Defendant and his firearm, he again observed the plastic bag that he had previously seen the Defendant carrying and viewed what he believed to be illegal drugs,

namely crack cocaine.  (Tr. at 12, 32-34, 37-38, 42-43, 52-53.)  The Fourth Amendment does not prohibit warrantless seizure of evidence of a crime in plain view, so long as certain conditions are met.  See Horton v. California, 496 U.S. 128, 133-34 (1990).  In the instant case, the Court has already determined that Officer Reese had not violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.  Horton, 496 U.S. at 136.  On the contrary, Officer Reese viewed the evidence both from a public parking lot and during the course of a permissible Terry investigative stop.  (Tr. at 12, 32-34, 37-38, 42-43, 52-53.)  See Horton, 496 U.S. at 136.  Further, the incriminating character of the evidence was immediately apparent to Officer Reese based upon his previous arrests involving crack cocaine, his familiarity with the appearance of crack cocaine, and his familiarity with the manner of packaging crack cocaine.  (Tr. at 42-43, 52-53.)  Finally, Officer Reese was lawfully located on public premises in a place from which the object could be plainly seen.  (Tr. at 12, 32-34, 37-38, 42-43, 52-53.)  Thus, the Court concludes that the Fourth Amendment was not violated by Officer Reese's seizure of the illegal drugs that were in plain view.

Finally, the Defendant asserts that his statement declaring to Officer Reese, "I have a gun in my back pocket," should be suppressed if it occurred subsequent to a Fourth Amendment violation.  See United States v. Crowder, 62 F.3d 782, 786 (6th Cir 1995) (quoting Oregon v. Elstad, 470 U.S. 298, 306 (1985)) (holding that a Fourth Amendment violation may taint a subsequent confession).  However, the Court has concluded that no Fourth Amendment violation occurred in the instant case.  Therefore, the Court finds no basis for suppressing Defendant's statement.

Accordingly, the Court concludes that no constitutional violation occurred in the instant case to warrant the suppression of the evidence of the firearm, the drugs, or the Defendant's statements.

11

Thus, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**IT IS SO ORDERED** this 13th day of September, 2010.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.  28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**